**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOLANDA BLASSINGAME, for herself and on behalf of her minor children, JADEN FIELDS, JEREMY HARRIS and JUSTIN HARRIS, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. |
| v. | ) ) | Judge |
| THE CITY OF CHICAGO; Chicago police officers MICHAEL PADALINO (Star #15680); KEVIN SELLERS (#13523); SERGEANT DONALD KROSKI (#1777); GERALD LEE (#15949); PAUL MEAGHER (#8762); SERGEANT JOHN HROMA (#1729); and OTHER, CURRENTLY UNKNOWN CHICAGO POLICE OFFICERS, | ) ) ) ) ) ) ) ) ) ) | Magistrate Judge Jury Demanded |
| Defendants. | ) ) ) | |

## COMPLAINT

### Summary

1.     Plaintiffs, by and through their attorney, The Law Offices of Al Hofeld, Jr., LLC, bring this action against defendant City of Chicago pursuant to 42 U. S. C. § 1983 for traumatizing three young children and violating their Constitutional rights and those of their mother, stating as follows:

2.     At approximately 4:00PM on Thursday, January 29, 2015, brothers Jaden Fields, Jeremy and Justin Harris (ages 11, 6, 4 at the time, respectively) and their cousin Nasir ("Naz") Norman (age 11 at the time) were doing homework and playing video games in the front rooms of their second-floor apartment at 1856 S. Lawndale, as their mother, Jolanda Blassingame, cooked friend chicken for dinner.

3.      Without announcing their office or providing other forewarning, Chicago police SWAT and plainclothes officers broke into the front and back doors of the apartment, threw flashbang grenades inside, and cursed and pointed assault rifles at the children in order to execute a search warrant.

4.      It was all a big mistake, a huge blunder that hurt an innocent family.  The target of the search warrant, the person named in the warrant, Derec Bell, not only did not live in the Blassingame's apartment, but, according to CPD's own criminal database, which officers simply failed to check, Bell was then serving a 20-year prison sentence for a murder conviction 200 miles away in Hill Correctional Center in Galesburg, Illinois.  He had been in prison since June, 2009.  On the date of this raid, he had been in prison for five-and-half-years, and his projected parole date was in 2052.  All of this was also public information.

5.      Officers did not arrest or charge Ms. Blassingame or her sons, who at the time had lived in the apartment for over two years and had never heard of or met a Derec Bell. They did not find any of the items referenced in the warrant:  heroin, residency documents for Bell, paraphernalia used in the weighing, cutting or mixing of illegal drugs, money, or records detailing illegal drug transactions.

6.      During the raid, officers repeatedly pointed and held their assault rifles at close range directly at the boys and their mother, even as she repeatedly asked them to lower their guns.  Officers' guns were loaded, and their fingers were on the triggers.  The children were afraid that they, their mother, and nephew were going to be shot.

7.      Ms. Blassingame and her sons followed all officer instructions at all times. They did not pose any apparent, actual or possible threat to the officers whatsoever at any time. Ms. Blassingame repeatedly told the officers they were making a mistake.

8.     Officers shouted profanity and used abusive and contemptuous language towards the boys and their mother throughout the raid.

9.     During the ensuing search, officers damaged or destroyed the children's toys, the family's possessions, and converted Ms. Blassingame's jewelry and other prized, family heirlooms.

10.     After nearly three hours of searching the Blassingame's apartment and not finding any contraband or any signs of Mr. Bell, officers simply left.  They never explained why they had been there or who they were looking for.  They did not apologize to the family for terrorizing them for no apparent reason.

11.     Chicago police terrorized an innocent family for no reason.  Their actions toward the children and their mother were not only completely avoidable, as the product of a reckless mistake and reckless police work, but their use of force was totally unnecessary, excessive, and without any lawful justification.

12.     This incident was not an isolated event:  it was undertaken pursuant to the City of Chicago's systemic, unofficial policy of using excessive police force against young children of color, as set forth below.

13.     For years now, ever since this incident, Jaden, Jeremy and Justin have suffered serious, emotional and psychological distress and disturbance, including many of the symptoms of Post-Traumatic Stress Disorder, as a direct result of their exposure to defendant officers' unnecessary and terrifying conduct.  These are scars on their young psyches that may never heal.

## JURISDICTION AND VENUE

14.     This action arises under 42 U. S. C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U. S. 658 (1978).  This Court has jurisdiction

pursuant to 28 U. S. C. §§ 1331 and 1343.  The Court has supplemental jurisdiction of plaintiffs'

state law claims.

15.     Venue is proper pursuant to 28 U. S. C. § 1391(b).  The underlying events

occurred within the Northern District of Illinois; defendant City of Chicago is a municipal

corporation located within the District; and all parties reside in the District.

## PARTIES

16.     At the time of all relevant events, plaintiff Jaden Fields was an eleven-

year-old boy residing with his mother at 1856 S. Lawndale Avenue, second floor apartment, in

Chicago, Illinois.  On January 29, 2015, Jaden was in sixth grade.

17.     At the time of all relevant events, plaintiff Jeremy Harris was a six-year-

old boy residing with his mother at 1856 S. Lawndale Avenue, second floor apartment, in

Chicago, Illinois.  On January 29, 2015, Jeremy was in first grade.

18.     At the time of all relevant events, plaintiff Justin Harris was a four-year-

old boy residing with his mother at 1856 S. Lawndale Avenue, second floor apartment, in

Chicago, Illinois.  On January 29, 2015, Jeremy was in kindergarten.

19.     Plaintiff Jolanda Blassingame ("Ms. Blasingame") is Jaden, Jeremy, and

Justin's natural mother.  At the time of all relevant events, she resided with her children at 1856

S. Lawndale Avenue, second floor apartment, in Chicago, Illinois.  Plaintiffs moved into the

apartment in approximately November, 2012.

20.     Ms. Blassingame works full-time as the sole breadwinner for her three

children.  She is the director of a child day care center where she supervises a staff of 16 and has

ultimate responsibility for 120 children.  She has a college degree and is pursuing a master's

degree in early childhood education at National Lewis University.

21.     She has never been arrested.  Her children have never been arrested.

22.     Plaintiffs are African-American.

23.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

24.     At the time of all relevant events, defendant Michael Padalino (star #15680) was a Chicago police officer assigned to Unit 189 Narcotics Section, Organized Crime Division.  He was the affiant of the complaint for search warrant for Derec Bell.  He and at least the following other defendant Chicago police officers, believed to be members of the same unit, participated in recklessly obtaining, approving, and/or executing the search warrant at plaintiffs' apartment:  Kevin Sellers (#13523); Sergeant Donald Kroski (#1777); Gerald Lee (#15949); and other, presently unknown Chicago police officers.

25.     In addition, members of a CPD SWAT team participated in forcefully entering, securing and clearing plaintiffs' apartment with excessive force.  They include Sergeant John Hroma (#1729), believed to be a SWAT team supervisor, and other, presently unknown Chicago police officers.[1]

26.     On information and belief, all or nearly all of the officers who participated in the execution of the search warrant on January 29, 2015, were Caucasian males.

27.     When Chicago police officers executed their search warrant at 1856 S. Lawndale Avenue, second floor apartment, they were at all times acting under color of law and

---

[1] As of the filing date of this lawsuit, CPD had not responded to plaintiffs' pre-suit FOIA request for comprehensive information about this raid.  Officers on the scene did not wear badges and nameplates, and SWAT officers had their faces covered with helmets and masks.  Officers flatly refused to provide plaintiffs their names and badge numbers when asked, and the incident occurred nearly five years ago.  Consequently, plaintiffs are forced to rely on discovery in order to identify the remainder of the officers who should be defendants and will promptly amend their complaint once they obtain complete records for this raid, including the names and official CPD file photos of all officers who participated.

within the scope of their employment as officers of the Chicago Police Department ("CPD") for the City of Chicago.

### Overview: CPD's <u>M. O.</u> is to Unnecessarily Use Force Against and in the Presence of Young Children

28.     Chicago police officers have a *de facto* policy, widespread custom or *M. O.* of unnecessarily using force against or in the presence of children (ages 0-14), especially children of color, which traumatizes them.

29.     The 2017 United States Department of Justice investigation of the CPD concluded, among other things, that CPD has a pattern and practice of using less-than-lethal, excessive force against children for non-criminal conduct.  (U. S. Dept. of Justice *Investigation of the Chicago Police Department*, Civil Rights Division and U. S. Attorney's Office for the Northern District of Illinois, Jan. 13, 2017, pp. 34-35).

30.     The 2016 report of the mayoral-appointed Chicago Police Accountability Task Force ("PATF") contained substantially similar conclusions and recommended a number of specific police reforms to improve police-youth interactions and the policing of youth.

31.     None of the reforms that CPD has implemented or announced to date purport to remedy or address the identified problems.

32.     The federal consent decree agreed to by the City of Chicago and the State of Illinois in 2018 does not address them.

33.     CPD's recently revised use of force policy, GO3-02, does not expressly require officers to avoid using unnecessary force against or in the presence of young children whenever possible and does not require officers to use a trauma-informed approach to the use of force in situations where some police force is necessary.  CPD's search warrant policy, SO9-14, was not revised to incorporate these or similar changes.

34.     Unlike other major U.S. metropolitan police departments - such as Cleveland, Indianapolis, Charlotte, Baltimore, San Francisco and many others - CPD still does not provide any training or supervision to officers concerning youth brain development or the importance of preventing trauma to young children by utilizing a trauma-informed approach to the use-of-force in situations where children are present.

35.     The connection between trauma and child development and between trauma and mental and physical health is now well-established.

36.     It is also well-known that many poor children of color have already been subjected to multiple traumas in the neighborhoods and circumstances in which they live and, therefore, that police use of unnecessary force against them or in their presence only compounds their already profoundly traumatic life experience.

## FACTS RELATING TO ALL COUNTS

### *Chicago Police Obtain a Residential Search Warrant for Someone Who, CPD's Own Criminal Database Showed, Was in Prison at the Time*

37.     At approximately 2:30PM on January 29, 2015, defendant officer Padalino swore out and obtained a search warrant authorizing a search of Derec Bell, AKA "Ace," and the premises at 1856 S. Lawndale Avenue, 2nd floor apartment, Chicago, IL. The warrant authorized the seizure of Heroin, any residency documents, any paraphernalia used in the weighing, cutting or mixing of illegal drugs, any money, and any records detailing illegal drug transactions.

38.     Officer Padalino's complaint for search warrant stated, entirely erroneously, based solely on information from a John Doe confidential informant, that Mr. Bell was selling drugs from 1856 S. Lawndale, second floor apartment, Chicago. The informant had just been released from serving a jail sentence.

39.     The problem was that officer Padalino and officers assisting him did not bother to perform the simplest, most routine verification of the John Doe's representation by checking CPD's own criminal history database, the CLEAR (Citizen and Law Enforcement Analysis and Reporting) system, for Mr. Bell.  Sergeant Kroski did find his mugshot and showed it to the John Doe, but officers didn't check Bell's criminal history; had they done so, they would have seen that he was incarcerated.  Officers also had access to the Illinois Department of Corrections website, which is public and which showed that Bell was incarcerated at the time. Finally, Lexis-Nexis showed that Bell had not resided at 1856 S. Lawndale, second floor, since May, 2011.

40.     Had officers done one of these routine checks, they would have discovered that what the John Doe had told him was impossible because Mr. Bell was, at that time and for five-and-half-years running, serving a prison sentence for murder and two other convictions in the Hill Correctional Center in Galesburg, Illinois, and was not projected to be paroled until 2052 or released until 2055.

41.     On January 29, 2015, Mr. Bell was not selling drugs at 1856 S. Lawndale, did not reside there, and had not lived there for at least six years as of that date - since before June 2009, which is when he began serving his prison sentence.  He was arrested in December, 2006.  At that time or before - in other words, eight years before officers sought the search warrant - he had lived at 1856 S. Lawndale, second floor.

42.     Defendant officer Padalino and other defendant officers failed to perform the most minimal verification of the information from the John Doe, who they knew was an admitted felon who recently been released from prison.

43.     The facts that a Chicago police officer alleges in a complaint for search warrant are required to be "credible and reliable."  (CPD SO4-19, VI.B.a.).  To this end, a Chicago police officer swearing out a search warrant under oath before a judge is required to "thoroughly conduct[]" the "investigation leading up to the need for a search warrant."  (CPD SO4-19).

44.     And, crucially, CPD SO4-19 requires the affiant of a complaint for search warrant to *independently* investigate and verify the information provided by a John Doe confidential informant, including information about where the intended target resided or could be found.

45.     In other words, as the sworn applicant for the warrant, officer Padalino had a duty to discover, diligently and in good faith, and disclose to the issuing warrant judge whether he had identified the correct apartment or place to be searched (and not the residence of an innocent third party, like plaintiffs).

46.     All of this was and is required because the law respects citizens' Fourth Amendment rights, including the Fourth Amendment rights of innocent citizens who are not criminal suspects.

47.     In direct violation of CPD policy and the Fourth Amendment, officer Padalino and other officers involved in obtaining and approving the search warrant performed zero independent investigation or surveillance to verify that Mr. Bell was selling drugs at, lived or could be found at 1856 S. Lawndale, as the John Doe confidential informant told him.

48.     Defendants could have made any of a number of simple inquiries.  They could have checked their own criminal history database, the CLEAR system, as they customarily do in search warrant investigations.  They could have checked the public Illinois Department of

Corrections website.  They could have run a person search on Lexis Nexis.  They could have performed minimal surveillance of the back of the building from the alley.  They could have contacted the building's owner and landlord.  They could have contacted, or asked the state's attorney to subpoena, a utility company supplying energy to the building or apartment.  They could have utilized CPD's database, Accurint, which matches addresses with names.

49.     But officer Padalino neglected to conduct any investigation, any verification, as was required by SO4-19.  He simply trusted what the criminally active John Doe told him was true.

50.     Consequently, his sworn complaint for search warrant was fundamentally inaccurate about who was inside and what was taking place at 1856 S. Lawndale, second floor apartment.  In spite of what they told Judge Sacks, police did not have probable cause to believe that Padalino was selling drugs there and, therefore, to enter and conduct a search at that address.

51.     Because Padalino and other officers failed in their minimal official duty to independently investigate and verify the location of the person to be searched, theirs was not a good faith error.

52.     Similarly, on information and belief, the CPD lieutenant who approved officer Padalino's complaint for search warrant simply "rubberstamped" it, without taking any steps to ensure that officer Padalino or other officers had performed the due diligence required by CPD Special Order S04-19.  Taking these vital steps was what the lieutenant was officially required to do.

53.     On January 29, 2015, defendant officers reasonably knew or should have known that the intended target of warrant did not reside at 1856 S. Lawndale, second floor, but was incarcerated 200 miles away.

54.     Moreover, as is customary in Chicago, the defendant officers, in the course of obtaining and executing the search warrant, took no steps to first determine whether children resided in the basement unit or in the house, to avoid entering at times when children were likely to be present, or to deescalate their use of force tactics when they unexpectedly encountered young children in the second floor apartment at 1856 S. Lawndale. As a result, officers injured Jaden, Jeremy and Justin.

### *Officers Point Guns at Children and Destroy Their Toys and Other Property*

55.     At approximately 4:00PM on Thursday afternoon after school, January 29, 2015, Jaden, Jeremy, Justin and their cousin Naz were in the front of the four-bedroom apartment. Jaden and Naz were in Jaden's room playing a video game. Jeremy and Justin were in the living room watching TV. Ms. Blassingame was cooking chicken in the kitchen located at the back of the apartment. She was just returning to the kitchen from checking on the boys.

56.     The family heard pounding at the back door and, a few seconds later, on the downstairs front door and on her apartment door. Officers did not announce their office. Ms. Blasingame first thought someone was trying break into the apartment.

57.     Terrified, she led the boys into the front bedroom, Jaden's bedroom, got on the floor, and told the boys to get behind her. She peaked out towards the front hallway and front door. Naz hid in the bedroom closet.

58.     At this point, the family heard several explosions, saw flashing lights, the apartment filled with smoke, and there were police officers throughout the apartment and guns pointing at them. The officers the family saw first appeared to all be SWAT officers.

59.     Ms. Blassingame announced that the only people in the apartment were her and her children and asked officers, "Can you put the guns away?"

60.     In response, officers yelled at her and the children to "GET ON THE GROUND!"

61.     At least two SWAT officers entered Jaden's bedroom where Ms. Blasingame and the four boys were and pointed guns at them.  A first officer pointed a big, long gun, believed to be an assault rifle, directly in Ms. Blassingame's face and at the boys.  Ms. Blasingame was kneeling with her arms outstretched to cover the boys, who were lying down, cowering, directly behind her.  Another officer pointed an assault rifle at the boys as he was searching the closet in Jaden's bedroom.

62.     Ms. Blasingame asked a second time, "Can you take the gun out of my face?  There's no one here but me and my kids."  Ms. Blasingame continued to ask officers to "get the guns off of me and my kids."  They did not take the guns off of Ms. Blasingame and the four boys.

63.     After an officer yelled, "CLEAR!" officers ordered Ms. Blasingame and the four boys to put their hands up walk to the kitchen.  They followed instructions and walked through the long narrow apartment to the kitchen.  As they walked, officers walking in front of them and in back of them continued to point their guns at them at close range.  The guns were one-and-half-to-two-feet from their bodies.

64.     While they walked, Ms. Blasingame continued to ask, "Why are you pointing guns at us?  They're only kids."  The officers did not stop pointing their guns at the children.

65.     Once they reached the kitchen, officers ordered Ms. Blasingame and the four children to "GET ON THE GROUND!  GET ON THE GROUND!"  They told them to get down and lay down flat on the floor by the refrigerator.  As they did so, officers continued to

point their guns at them. They also pointed guns at them when they were down on the floor and had been down on the floor.

66. The officers did not care about or think twice before pointing guns at these African-American boys. They were callous towards them. They asked 11-year-old Nasir if he had gone to jail before.

67. Officers kept the family confined on the kitchen floor for the next three hours while they searched throughout the apartment. At one point, plaintiffs were on their knees on the kitchen floor with their hands behind their backs.

68. Ms. Blassingame repeatedly asked officers why they were there and who they were looking for. They would not tell her. They did not give or show her a search warrant.

69. Officers did initially mention that they had a search warrant, but when Ms. Blassingame asked for it, they told her to "SHUTUP AND GET DOWN!" Whenever she asked for it again, they told her to wait. Approximately three hours later, as officers were leaving, the supervising officer on the scene gave Ms. Blassingame a copy of the warrant.

70. Throughout the raid, officers were rude and used profanity constantly in front of the children. The officer in charge cursed and screamed throughout the raid, including at the children. They told Ms. Blassingame in front of her children, "GO STAND BY THE FUCKING REFRIGERATOR BEFORE THEY SEE YOU GO TO JAIL." When Ms. Blassingame came into her bedroom to show officers where something was located, the moment she had finished they repeatedly told her to "GET THE FUCK OUT."

71. Three officers, including the supervising officer, bragged and laughed with other officers that they had thrown flash bang grenades into the apartment and scared the children.

72.     Officers, including the supervising officer in charge of the raid, refused to give Ms. Blassingame their name or badge numbers when she asked for them.  They were not wearing badges or nameplates.

73.     Officers were inside Ms. Blassingame's residence for over three hours. They did not leave until after 7:00PM.

### *Officers Damage or Convert the Family's Possessions, Including the Children's Toys*

74.     During plaintiffs' three-plus hour detention in the kitchen, officers tossed and searched plaintiffs' apartment high and low.  Confined in the kitchen, Ms. Blassingame and her sons could hear officers going through the rooms and knocking things down and searching throughout the apartment.

75.     An officer searched through Ms. Blassingame's mail before telling another officer, "I don't see any mail with his name on it."

76.     When police saw the picture of Ms. Blassingame's fiancé at the time, Jeremy and Justin's father, Jeremy Harris, hanging in Ms. Blassingame's bedroom, an officer asked another, "Is this the one?"  The other officer said, "no."

77.     Officers did not take pre-execution photos of plaintiffs' apartment, as required; they only took photographs after they searched.

78.     Officers kept repeating the phrases, "marked money" and "marked funds," and asking Ms. Blassingame where the marked money was.  Apparently, police had given the John Doe informant marked money to make a drug buy, but he did not enter plaintiffs' apartment, and after the raid he was sighted outside the building.

79.     Officers questioned Ms. Blassingame, asking her who as else stays with her, and she answered, "no one besides me and my boys."

80.     Officers were especially focused on searching Ms. Blassingame's bedroom.  She saw at least three or four officers in her room.  One had a bag on his back.

81.     In her bedroom, officers were focused on a vent.  They had taken out and down the metal vent that was high up on the wall near the ceiling above her bed.  They did not find anything inside the vent.

82.     Officers took and did not return several valuable items of plaintiffs' personal property.  Officers took Ms. Blassingame's black diamond earrings that her mother-in-law had given her for her birthday.  They were sitting on her dresser in her bedroom before the police arrived.  They also took a silver cross pendant on a chain that had been a gift from her mother.

83.     Without asking to see a FOID card first, which she told them she had, officers confiscated and did not return Ms. Blassingame's personal gun, which she had just received before the raid as a gift from her fiancé who wanted her to have protection.  She led officers to the location of her gun when they asked if she had any weapons in the house.

84.     Officers also took and did not return the title and the key to her brother's car from Ms. Blassingame's dresser in her bedroom.

85.     Officers also took Ms. Blassingame's brother's army bullet proof vest, which his name and serial number on it.  Her brother had just returned from a tour of duty in Asia and gave his vest to Jaden as a souvenir.

86.     Officers took these and other items, and Ms. Blassingame never got any of them back, even after going to CPD in person and requesting them.

87.     Officers had Ms. Blassingame sign an evidence log.  When she signed the original, it listed a few items.  Later, when they gave her a copy, it had additional items on it,

which were not hers and/or were not found in her apartment.  When she confronted officers

about this, they told her to take it up with someone else.

88.     Officers caused damage throughout the apartment, including to the front

outer door, the front inner door, the front and back apartment doors and the front and back entry

gates to the property.  Ms. Blassingame paid her father to fix her apartment front door

immediately because officers had broken the lock.  The first night after officers left, Ms.

Blasingame pushed a deep freezer in front of the apartment front door in order to get a measure

of security.

89.     Officers broke multiple parts of Ms. Blassingame's bedframe and left

footprints in her mattress when they were trying to reach the vent, and she had to purchase a new

bed.  Police also broke both of Ms. Blassingame's dressers, and she had to throw them away.

They threw her flat screen TV on the floor and broke it.  They broke a kitchen chair that was part

of a set her mother had given her.  They damaged and left behind her safe, which she used to

store important papers in.

90.     Officers took clothes out of six dresser drawers and threw them on the

floor; some of them got soda pop on them and had to be thrown out.

91.     In Jaden's room, officers broke Jaden's bed and his TV.  They left his

dressers open with his clothes strewn throughout the rooms.

92.     Officers also broke Jeremy's Play Station game, as well as his dresser and

closet door.  They also broke the boys' indoor basketball game.

93.     Officers did not arrest or charge anyone.  They did not find any Heroin or

other items listed in the search warrant, and they did not find Mr. Bell.

94. Officers never explained or apologized to the children or their family; they just laughed cynically as they left. They were sarcastic, rude, disrespectful, and cocky. They were at plaintiffs' residence for approximately 40-45 minutes in total.

***Officers' Uses of Force Against Jaden, Jeremy, Justin and Their Mother
in their Presence Was Totally Unnecessary***

95. Plaintiffs presented absolutely no threat, real or apparent, to the police officers entering into and searching their home.

96. Even though they presented no threat, officers repeatedly pointed their guns at them, and other officers did not ask those pointing guns at the children and their mother to stop doing it.

97. Moreover, plaintiffs posed no threat to officers after they discovered that no one who looked anything like the intended target of the warrant was in the apartment.

98. Plaintiffs have been harmed by officers' unnecessary pointing of guns, unlawful detention, unlawful search of their persons and home, and destruction of property.

***Officers' Unnecessary Uses of Force Traumatized Jaden, Jeremy and Justin
for Years Afterwards***

99. Chicago police officers' terrorizing conduct towards the minor plaintiffs and towards their mother in the children's presence caused Jaden, Jeremy and Justin immediate, severe and long lasting emotional and psychological distress and injury. Although the incident occurred nearly five years ago, all three boys are still deeply affected by defendant officers' misconduct.

100. In addition to still remembering flash bangs grenades being tossed into and exploding in their apartment and assault rifles pointed at them and their mother, the children

were also subject to and remember officers screaming, shouting and cursing at them and their mother.

101.     Prior to January 29, 2015, Jaden, Jeremy and Justin were happy, healthy children in a close, loving family.  Prior to this date, they had suffered no emotional or psychological trauma of any kind in their lives.  They believed police were to protect and help them.  This all changed with defendants' actions.

102.     Throughout their encounter with police, Jeremy and Justin were terrified, crying, and screaming.  All of the boys were physically cowering.  Based upon what they witnessed, they believed officers were going to shoot and kill them, their nephew and their mother.

103.     Ever since the incident, Jaden, Jeremy and Justin have continued to re-live, in various ways, how terrified they were that day.

104.     The children and their mother were unable to sleep and eat normally for a few weeks after the incident.  The boys had nightmares.  They lost all desire to play outside.  They talked about the incident frequently and persistently, especially about officers pointing guns at them.  When driving in the car with their mother, they would duck down whenever they saw a police car or police officers.

105.     As a result of the incident, the children, who, before the incident, were taught to believe that the purpose of police was to protect and help, now do not trust them.  Jeremy is especially afraid of the police.  Jaden had a job offer from CPD for summer, 2019, but he turned it down because he no longer likes, trusts or wants to work with the police as a result of their conduct towards he and his family.

106.    Jaden, who was the oldest at the time, has become or appeared very anti-social since the incident.  He stays in the house all day, every day when not in school, and no longer plays outside with his brothers and his friends, which he used to nearly every day before the raid.  Since the raid, he has also become more aggressive with his brothers.

107.    Immediately following the incident, Jeremy had bad dreams from which he would jump up and wake up suddenly, shouting.  Jeremy now has many phobias, none of which he had prior to the incident.  He is scared of the dark, of clowns, insects, bees, animals, and the police (He still ducks when he sees them).  He also had a serious stuttering problem after the incident, had an IEP because of it, and went through speech therapy for two school years.  Jeremy now eats more since the incident and is overweight.  He describes himself as eating to relieve his nervousness.  Since the incident, he is very emotional, and cries frequently, including over little things.  Jeremy, too, still talks about the incident unsolicited five years later.

108.    Justin, who was the youngest at the time, remembers the most about what happened.  He still talks about the incident unsolicited five years later.  Worse, his behavior was totally different after the incident.  He wanted to be with his mom constantly and would become anxious when they separated.  He began acting out in school shortly after the incident and has continued to get in trouble at school ever since.  Not long after the incident and more than once, he ran out of his school building to try to come home to his mother.  He became disruptive in the classroom.  Today, he calls home to his mother almost every day.  He saw a social worker at his school for a while.  His behavior at school was never an issue before the raid.  Now, he frequently gets in trouble with teachers and staff.

109.    Jaden, Justin and Jeremy now continue to experience and exhibit, unabated, these and other signs of severe emotional and psychological trauma and distress.

110. On information and belief, both children have long had, or have long had many of the symptoms of, severe Post-Traumatic Stress Disorder.

111. As a direct result of officers' conduct, the children are now being medically assessed for trauma inflicted by the Chicago police.

112. On information and belief, the children have required and now require high quality, long-term, costly, psychological care and counseling in order to cope with the long-term, psychological injuries caused by defendants' terrorizing display of unnecessary force.

113. Ms. Blassingame is also suffering mental distress as a result of officers' conduct.

114. Officers' shocking actions of repeatedly pointing and training loaded guns at close range on young children and their mother and detaining them for three hours for no reason constituted serious abuses of power and authority.

115. Officers' actions – including their inaction in the form of failing to intervene to request that fellow officers stop using excessive force - were directed towards *four-, six- and eleven-year-old children.* The children's sensitivity and vulnerability to such trauma-inducing violence was or should have been known to officers.

116. Officers' conduct was undertaken pursuant to and is part of the long-standing and widespread pattern and practice, *de facto* policy or *MO* of Chicago police officer use of excessive force noted above, which includes the use of unnecessary force against and/or in the presence of children, especially children of color.

### *Tolling of the Statute of Limitations On the Minors' Claims*

117. Although the incident took place January 29, 2015, pursuant to Illinois' tolling provision for minors, 735 ILCS § 5/13-211, the statutes of limitations on the minor

plaintiffs' claims were tolled on the date their claims accrued and remain tolled until the minor

plaintiffs reach the age of majority, at which point the applicable statutes of limitations begin to

run. In this case, none of the minor plaintiffs have reached the aged of majority yet.

### COUNT I – 42 U. S. C. § 1983 *MONELL* POLICY CLAIM
### AGAINST THE CITY OF CHICAGO
### (Minor Plaintiffs)

118.    Plaintiffs Jaden Fields, Jeremy and Justin Harris re-allege all paragraphs

1-117 above, including the *Monell*-related allegations of paragraphs 22-36, 147-161 below, and

incorporate them all into this count. They assert this claim against defendant City of Chicago.

119.    Defendant officers' use of excessive force against and in the presence of

the children was directly and proximately caused by one or more of the following three, specific,

long-standing, interrelated, *failures* of official policy, *lack* of official policy, *de facto* policies,

widespread practices, and/or customs of the City of Chicago: 1) a pattern and practice of using

unnecessary or excessive force against children (ages 0-14); 2) a systemic failure to investigate

and discipline and/or otherwise correct allegations/incidents of officer excessive force against

children; and 3) an absence of official policy and training to avoid the unnecessary or excessive

use of force against and in the presence of children. Each of these policies existed for more than

six years prior to January 29, 2015 ("the *Monell* period").

120.    First, defendant City of Chicago has a long-standing, pervasive practice

and custom of failing to adequately investigate, intervene with and discipline or otherwise correct

officers for the use of excessive force involving children (ages 0-14), including unnecessary force

directed at children and/or at adult family members in the presence of children.

121.    This set of City's widespread practices or customs directly encouraged,

authorized and caused officers' conduct toward the children. The City's historical failure,

leading up to January 29, 2015, to properly intervene in, investigate and discipline officer excessive force, especially excessive force against or in the presence of young children, caused officers to act without appropriate restraints in the presence of Jaden, Jeremy and Justin.

122. This was facilitated by unjustified exemptions from the bodycam mandate and a complete lack of official disciplinary consequences for officers who do not wear or do not turn on their bodycams.

123. The City was on notice of each of these failures of official policy from the specific conclusions reached by and the data contained in the 2017 U. S. Department of Justice investigative and the PATF reports (citations above).

124. Second, defendant officers' conduct towards and in the presence of Jaden, Jeremy and Justin was undertaken as a direct consequence of defendant City of Chicago's long-standing failure to have *any* affirmative, official policies and/or training explicitly requiring officers to avoid using unnecessary or excessive force against children or against their adult relatives in the children's presence whenever possible.

125. Even after the findings of the U. S. Department of Justice investigation and the Mayor's PATF were known to City policy makers, the City failed to implement or announce implementation of any reforms that purported to remedy the pattern and practice of unnecessary use of force against and/or in the presence of children, a failure which amounted to a deliberate choice not to take action to prevent the violation of plaintiffs' constitutional rights. City and CPD's failure to implement these explicit policies, reforms and priorities was a cause of the injuries to Jaden, Jeremy and Justin.  Specifically, this lack of official policies, training, and reforms includes:

a.    The continued absence of any provision in CPD's official use of force policy that would explicitly guide or require officers to avoid using force against or in the presence of children, or to use a trauma-informed approach to the use of force in situations where children are present, and some force may necessary;

b.    CPD's continued failure to add, in its official use-of-force training curriculum and/or its on-the-job training and supervision of officers, any explicit guidance or requirement that officers should avoid using force against or in the presence of children, or to use a trauma-informed approach to the use of force in situations where children are present and some force may be necessary;

c.    CPD's continued failure to require officers seeking residential search warrants to make reasonable efforts before obtaining and/or executing the warrant to determine, through investigation and surveillance, (i) whether children reside in the residence, (b) to avoid entry and search at times when children are likely to be present (ii) to de-escalate themselves or change tactics when they unexpectedly encounter young children, and/or (iii) to take other precautions to avoid traumatizing children, such as avoiding placing parents and grandparents in handcuffs in the children's presence;

d.    CPD's rebuff, both before and since the U. S. Department of Justice and PATF reports were released, of national and local legal and/or community organizations that have offered to provide training on trauma-informed policing with children and/or offered model use-of-force policies that included explicit provision for avoiding the unnecessary use of force against and in the presence of children; and

e.    City's and CPD's refusal or failure to propose or agree to any explicit protections for children from excessive force or any provisions requiring a trauma-

informed approach to policing children in the federal consent decree it negotiated with the State of Illinois.

126.     Third, the City's lack of official policies to protect children from unnecessary officer use of force, combined with its failure to hold accountable officers who use unnecessary force involving children, have resulted in a *de facto* City policy and practice of using unnecessary or unreasonable force against young children and/or in their presence, as concluded by the U. S. Department of Justice investigation into the Chicago Police Department and the PATF. The excessive force used against or in the presence of Jaden, Jeremy and Justin was an example of and the result of this *de facto* policy.

127.     Through their combined failures, before and after notice, to enact official policies that protect children from unnecessary force and to hold accountable officers who use excessive force against children, the City has led police officers to be confident that such actions are acceptable and will not be challenged, investigated or disciplined by CPD, CPD's Bureau of Internal Affairs ("BIA"), the Chicago Police Board, the Independent Police Review Authority ("IPRA") or the Civilian Office of Police Accountability ("COPA"). These past failures directly authorized, encouraged and emboldened defendant officers' conduct against and in the presence of Jaden, Jeremy and Justin, providing them a general license to use excessive force involving children whenever it suits them.

128.     Through their combined failures, before and after notice, to enact official policies protecting children from unnecessary force and to hold accountable officers who use excessive force against children, final City of Chicago policy-makers – including the Superintendent of police, the Administrator of IPRA (now COPA), the head of CPD's BIA, the Mayor, and the Chicago City Council – condoned, approved, facilitated, encouraged and

perpetuated a *de facto* City policy and practice of unnecessary or excessive force against or in the presence of young children.

129. Additionally, the violation of the children's Four Amendment rights against illegal search was also caused by widespread City practices and *de facto* City policies. In particular, CPD has a *de facto* policy of applying for and executing residential search warrants based on inaccurate, unreliable and unverified information, with the consequence that half or a majority of all warrants executed are "negative," i.e., they result in no arrest. But they consistently result in excessive force, illegal search, terror and lasting trauma to innocent residents, including young children.

130. CPD fails to investigate, discipline and otherwise hold accountable officers who apply for and execute residential search warrants based on inaccurate, unreliable and unverified information.

131. Nor does CPD audit, monitor or track residential search warrants in the aggregate, even on a sample basis, in order to identify and evaluate investigative practice issues (such as whether officers are doing enough to verify the current or correct address for the target) and improve the accuracy and reliability of search warrant investigations, despite the fact that such measures could boost "positive" warrant results and inflict less trauma on innocent bystanders, including young children.

132. During all times relevant to the incident involving Jaden, Jeremy and Justin, a "code of silence" pervaded the police accountability system in Chicago, including CPD's BIA, the Chicago Police Board, IPRA and COPA, contributing to these agencies' collective failure to properly investigate and discipline officer excessive force, including excessive force against children. Unjustified exemptions from the bodycam mandate and a

complete lack of official discipline and accountability for officers who do not wear or do not turn

on their bodycams reinforce the code of silence. Defendant officers' conduct toward Jaden,

Jeremy and Justin, including their failure to intervene and failure to report the actions of their

colleagues, was the direct result of the long-standing and systematic code of silence at work in

the City's police investigative and disciplinary systems.

133. By means of its pervasive customs and practices above and its failures,

after notice, to remedy officers' use of unnecessary force against and/or in the presence of young

children, defendant City of Chicago has manifested and manifests deliberate indifference to the

deprivation of Jaden, Jeremy and Justin's constitutional rights.

134. One or more of these three polices, practices and customs collectively,

directly and proximately caused the violations of Jaden, Jeremy and Justin's constitutional rights

set forth above and below and the resulting injuries, such that the City of Chicago is liable for

officers' use of excessive force against them and/or in their presence.

### The City of Chicago's <u>De Facto</u> Policies Resulted in Violations of Jaden, Jeremy and Justin's Constitutional Right to be Free of Unnecessary or Excessive Force

135. Officers' conduct toward each Jaden, Jeremy and Justin constituted

excessive force, in violation of their rights under the Fourth and Fourteenth Amendments to the

U. S. Constitution.

136. Under the circumstances, officers' displays of force against and in the

presence of young children was totally unnecessary, unreasonable and unjustifiable.

137. Under the circumstances, officers' uses of force against Ms. Blassingame,

undertaken in the presence of and witnessed by Jaden, Jeremy and Justin, was totally

unnecessary, unreasonable and unjustifiable.

138. Officers failed to intervene to stop any use of force.

139.    Officers' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Jaden, Jeremy and Justin's constitutional rights.

140.    Officers' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

141.    The officers' misconduct was undertaken pursuant to and as the direct and proximate result of the Defendant City of Chicago's *de facto* policy, failures of official policy, absences of affirmative policy, and pervasive, long-standing practices and customs, as set forth above, such that defendant City of Chicago is liable for officers' use of unnecessary force against and in the presence of Jaden, Jeremy and Justin.

142.    As the direct and proximate result of officers' misconduct, plaintiffs Jaden, Jeremy and Justin have suffered and continue to suffer severe, long-term emotional and mental distress and trauma, including lasting or permanent psychological injury.

143.    One or more officers had a reasonable opportunity to prevent or stop the violations of Jaden, Jeremy and Justin's constitutional rights but stood by and failed to take any action.

144.    Officers' inactions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to TJ Jaden, Jeremy and Justin's constitutional rights.

145.    As set forth above, the officer misconduct was undertaken pursuant to the *de facto* policies, long-standing and pervasive practices and customs of defendant City of Chicago, such that the City of Chicago is also liable for officers' failure to intervene.

146.    As the direct and proximate result of officers' misconduct, Jaden, Jeremy and Justin suffered and continue to suffer injury and harm.

## COUNT II – UNLAWFUL SEARCH – INVALID WARRANT - 42 U. S. C. § 1983
### (Minor Plaintiffs)

147.    Plaintiffs Jaden, Jeremy and Justin re-allege paragraphs 1 – 117 above and incorporate them into this count.  They assert this claim against defendant officers and any as yet unknown officers who participated in obtaining the search warrant for 1856 S. Lawndale, second floor.

148.    Defendant officers unreasonably approved, obtained and executed a search warrant for a person who, officers knew or should have known, had no connection with plaintiffs' address, a fact which invalidated the warrant from the start, prior to execution.

149.    Officers' subsequent unauthorized entry and search violated plaintiffs' Fourth Amendment right to be free from unreasonable searches of their persons and homes.

150.    As the sworn applicant for the warrant, officer Padalino and those who assisted him had an official duty to discover and disclose to the issuing magistrate, Judge Sacks, whether he had identified the correct address or place to be searched and not the residence of an innocent third party.

151.    Officer Padalino and other defendant officers reasonably knew or should have known that the intended target(s) of the warrant would not be found at plaintiffs' address; they knew or should have known he was in prison at the time.

152.    Officer Padalino and the other officers had an official duty to reasonably investigate and verify information they received from the felonious John Doe about the target's whereabouts.

153.    Such an inquiry was so simple to make.  For starters, he should have done a simple check of CPD's CLEAR database, which would have indicated that the target was incarcerated.  He also could have checked the publicly accessible Illinois Department of

Corrections website. As alleged above, officer Padalino and other officers had multiple sources of information available to them at the time, had they bothered to use them.

154. However, on information and belief, officer Padalino and others recklessly did not conduct any investigation or verification or failed to conduct a reasonable one.

155. Consequently, in their complaint for search warrant defendant officers identified the wrong address, plaintiffs' address, a place they never had probable cause to enter and search. Because officers recklessly and utterly failed to independently investigate and verify the place to be searched, theirs was not a good faith error.

156. A CPD Lieutenant approved officer Padalino's application for search warrant without ensuring that officer Padalino and other officers had performed the due diligence required by CPD Special Order S04-19.

157. Officers' actions in these respects were objectively unreasonable and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

158. As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

159. Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs. Defendant officers' shocking inaction in failing to perform required and basic reasonable due diligence to verify the correct location for a search warrant before raiding and searching citizens' residence constituted an abuse of power and authority. Defendant officers' actions – of relying solely on location information provided by a John Doe confidential informant who was a convicted felon with numerous prior arrests for handling and selling

narcotics and not conducting their own investigation and surveillance to verify the address - were directed towards honest, hard-working citizens who were totally innocent of all criminal conduct.

160.    Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

161.    In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, especially Jaden, Jeremy and Justin, defendants' conduct merits an award of punitive damages.

## COUNT III – UNLAWFUL SEARCH – UNREASONABLE MANNER OF ENTRY AND SEARCH – 42 U. S. C. § 1983
### (Minor Plaintiffs)

162.    Plaintiffs Jaden, Jeremy and Justin re-allege paragraphs 1 – 117 above and incorporate them into this count.  They assert this claim against all defendant officers who entered and/or searched their apartment.

163.    The manner in which officers conducted their entry into and search of plaintiffs' apartment were objectively unreasonable, in violation of Plaintiffs' Fourth Amendment rights.

164.    For example, when these officers entered plaintiffs' apartment, they did not knock or announce themselves or their office in circumstances where it was required, they pointed guns at plaintiffs from close range, they screamed and cursed at plaintiffs, and they intentionally damaged, destroyed or converted plaintiffs' personal property, including the children's toys – all in front of the children.

165. Further, it was unreasonable for officers to plaintiffs for three hours on the kitchen floor, an unreasonable length of time and in an unreasonable and humiliating manner.

166. Officers' manner of entry and search was objectively unreasonable in these and other ways and was undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

167. Under the circumstances, officers had reasonable alternative law enforcement techniques available to them for effective entry and search.

168. As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

169. Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs. Defendant officers' shocking displays of force against a totally unarmed family with young children constituted an abuse of power and authority. Defendant officers' actions set forth above were directed towards unarmed citizens who were fully compliant and cooperative and innocent of all criminal conduct.

170. Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others, especially children. Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved. Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

171.     In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, especially Jaden, Jeremy and Justin, defendants' conduct merits an award of punitive damages.

## COUNT IV – FALSE ARREST AND FALSE IMPRISONMENT – 42 U. S. C. § 1983
### (Minor Plaintiffs)

172.     Plaintiffs Jaden, Jeremy and Justin re-allege paragraphs 1 – 117 above and incorporate them into this count.  They assert this claim against the defendant officer(s) who detained them and those who declined to intervene.

173.     Officers arrested and imprisoned plaintiff when, (a) without a warrant for their arrest and without probable cause to arrest her, they confined them to lying or sitting on the kitchen floor for three hours.

174.     Officers' actions constituted a violation of plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures.

175.     When officers confined plaintiffs, they unlawfully deprived them of their liberty to move about, despite the fact that they had not done nothing illegal, were not a safety threat, and that officers had no probable cause for their arrest and imprisonment.  This violated plaintiffs' rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

176.     Moreover, one or more officers had a reasonable opportunity to prevent or stop the violations of plaintiffs' constitutional rights but stood by and failed to take any action.

177.     Through physical force and the invalid use of legal authority, officers acted to arrest, restrain and confine plaintiffs to a bounded area.

178.     Plaintiffs were acutely aware of and were harmed by officers' confinement, as detailed above.

179.     Officers' actions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

180.     As the direct and proximate result of officers' misconduct, plaintiffs suffered and continued to suffer injury and harm.

## COUNT V – UNCONSTITUTIONAL SEIZURE OF PROPERTY - 42 U. S. C. § 1983
### (Minor Plaintiffs)

181.     Plaintiffs Jaden Fields and Jeremy and Justin Harris incorporate paragraphs 1 – 117 above and assert this claim against defendant officers who participated in the search of plaintiffs' residence.

182.     As set forth above, defendant officers unnecessarily and willfully converted, damaged or destroyed plaintiffs' real and personal property during the course of their search.  Defendant officers took these actions without any lawful basis and without ever returning plaintiffs' property to them or paying them compensation for damage or destruction they caused.

183.     Defendant officers' actions constituted an unreasonable seizure of plaintiffs' property, in violation of their rights under the Fourth Amendment and Fourteenth Amendments to the U. S. Constitution, as well as a deprivation of property without due process of law, in violation of their rights under the Fourteenth Amendment.

184.     Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful, malicious and reckless indifference to plaintiffs' constitutional rights.

185.     Defendants' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

186.     As a result of defendant officers' misconduct described in this Count, plaintiffs have suffered injury, including emotional distress and financial harm.

## COUNT VI – ASSAULT – STATE LAW
**(Minor Plaintiffs)**

187.    Minor plaintiffs re-allege and incorporate paragraphs 1 – 117 above in this count.  They assert this claim against defendant City of Chicago.

188.    The actions of officers set forth above, including pointing guns at close range at the minor plaintiffs, created reasonable apprehensions in plaintiffs of immediate harmful contact to plaintiffs' persons.

189.    The officers intended to bring about apprehensions of immediate harmful contact in plaintiffs or knew that their actions would bring about such apprehensions.

190.    In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

191.    The conduct of defendant in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

192.    The Officers' actions were the direct and proximate cause of plaintiffs' apprehensions.

193.    Plaintiffs have been seriously harmed by officers' actions.

## COUNT VII – FALSE ARREST AND FALSE IMPRISONMENT– STATE LAW
**(Minor Plaintiffs)**

194.    Minor plaintiffs re-allege paragraphs 1 – 117 above and incorporates them into this count.  They assert this claim against defendant City of Chicago.

195.     Officers arrested and imprisoned plaintiffs when, (a) without a warrant for their arrest and without probable cause to arrest them, they (b) detained and confined them on the kitchen floor for three hours.

196.     Officers' actions restrained plaintiffs and confined them to a small, bounded area.

197.     Officers intended to restrain and confine plaintiffs to bounded areas within or outside the house.

198.     In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

199.     The conduct of defendant officers in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

200.     Officers' actions caused the restraint and confinement of plaintiffs to a small, bounded area within their residence.

201.      Plaintiffs were harmed by officers' actions in restraining and confining them, as detailed above.

### COUNT IX - INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – STATE LAW
**(Minor Plaintiffs)**

202.     The minor plaintiffs re-allege and incorporate paragraphs 1 – 117 above in this count and assert this claim against defendant City of Chicago.

203.    The actions, omissions and conduct of officers set forth above were extreme and outrageous and exceeded all bounds of human decency.

204.    Officers' actions, omissions and conduct above were undertaken with the intent to inflict and cause severe emotional distress to plaintiffs, with the knowledge of the high probability that their conduct would cause such distress, or in reckless disregard of the probability that their actions would cause such distress.

205.    Officers, who occupied positions of special trust and authority, knew, had reason to know or believed that plaintiffs, who were young children, were especially vulnerable and fragile.

206.    As a direct and proximate result of officers' extreme and outrageous conduct, plaintiffs suffered and continue to suffer long-term, severe emotional distress and trauma.

207.    In the alternative, officers owed plaintiffs a duty of care that they breached when they pointed guns at them, pointed guns at their mother in their presence, confined them to the kitchen floor for three hours, and destroyed their toys and other possessions.  Plaintiffs are direct victims of officers' negligent infliction of emotional distress.

208.    In the alternative again, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

209.    The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have

occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

214.    Officers' conduct was a proximate cause of plaintiffs' injuries and their extreme, severe, long-term emotional distress and trauma.

## COUNT X - TRESPASS – STATE LAW
### (Minor Plaintiffs)

215.    Minor plaintiffs re-allege paragraphs 1 – 117 above and incorporate them in this count. Plaintiffs assert this claim against defendant City of Chicago.

216.    By obtaining and executing the search warrant when officers did not have probable cause to believe that the target resided at the address given them by the John Doe, officers physically invaded plaintiffs' right to and enjoyment of exclusive possession of their residence.

217.    In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

218.    The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries. Numerous prior injuries have occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

219.    Officers' actions caused a physical invasion of plaintiffs' residence.

220.    Plaintiffs were harmed by officers' physical invasion of their residence.

## COUNT XI – *RESPONDEAT SUPERIOR* – STATE LAW
### (All Plaintiffs)

221.    Plaintiffs re-allege paragraphs 1-117 and 187 – 220 above and incorporate them into this count.  Plaintiffs assert this claim against defendant City of Chicago.

222.    In committing the acts and omissions alleged above, officers were at all times members and agents of CPD and the City of Chicago and were acting within the scope of their employment.

223.    Defendant City of Chicago is, therefore, liable as principal for all common law torts committed by its agents within the scope of their employment.

### COUNT XII – INDEMNIFICATION – STATE LAW
**(All Plaintiffs)**

224.    Plaintiffs re-allege and incorporate paragraphs 1-117 and 187 – 220 above. Plaintiffs assert this count against defendant City of Chicago.

225.    Illinois law, 745 ILCS 10/9-102, directs public entities to pay any common law tort judgment for compensatory damages for which employees are held liable within the scope of their employment activities.

226.    Involved officers were and are employees of the City of Chicago who acted within the scope of their employment when committing the actions and omissions detailed above.

### PRAYER FOR RELIEF (ALL COUNTS)

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendant on each count for:

a.      Compensatory damages;

b.      Punitive damages where pled in the counts above;

c.      Reasonable attorney's fees and litigation costs and expenses; and

d.      Such other or further relief as the Court deems just.

Respectfully submitted,


s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com

## JURY DEMAND

Plaintiffs demand trial by jury.


s/Al Hofeld, Jr.
Al Hofeld, Jr.


## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.


s/Al Hofeld, Jr.
Al Hofeld, Jr.


## NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Al Hofeld, Jr., an attorney for plaintiffs, hereby certify that on November 5, 2019, filing and service of the foregoing *Complaint* was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 and the Federal Rules of Civil Procedure as to service on any party who is not a Filing User or represented by a Filing User.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com